```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 13, 2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                :

KAREEM HAMILTON,                   :

                              :

               Plaintiff,     :

                              :         15-cv-4031 (KBF)

          -v-                  :

                              :

DEPUTY WARDEN; DEPUTY WARDEN OF :
SECURITY; JOSEPH PONTE; C.O. MILLER :
#8331; C.O. DAVIDSON #12593; CAPT.    :
MONROE; and CAPT. SAINT-FLEUR #106, :

                              :       MEMORANDUM

             Defendants.    :    OPINION & ORDER

                              :

------------------------------------------------------------X
                              :

KAREEM HAMILTON,                   :

                              :

               Plaintiff,     :

                              :        15-cv-9458 (KBF)

          -v-                  :

                              :

JOSEPH PONTE; DEPUTY WARDEN HAYES;:
DEPTY WARDEN KELLY; DEPUTY WARDEN:
DUNBAR; DEPUTY WARDEN PRESSLEY;   :
CHIEF CANTY; and ASSISTANT CHIEF   :
KENNETH STUKES,             :

                              :

             Defendants.    :

                              :

------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      Plaintiff Kareem Hamilton, a prisoner on Rikers Island who is proceeding pro

se before this Court, filed these related cases in May and December of 2015.  (4031

ECF No. 2 [Compl.]; 9458 ECF No. 2 [Compl.][1])  Both cases allege that the

---

[1] In this opinion, the notation "4031" refers to the docket of Hamilton's first-filed case, 15-cv-4031, and the notation "9458" refers the docket of the second case, 15-cv-9458.  Where a document appears on both dockets, only the 4031 notation will appear in this opinion.

conditions of Hamilton's confinement violate his civil rights under federal law and the United States Constitution.  (Id.; 4031 ECF No. 9 [Am. Compl.])  In February 2016, the Court ruled that while the cases remain separate actions, defendants would be permitted to file a single motion to dismiss both cases for failure to state a claim.  (4031 ECF No. 22.)  That motion is now before the Court.  (4031 ECF No. 23.)

For the reasons stated below, the motion to dismiss is GRANTED as to all claims for money damages and to all claims under the Eighth Amendment.  The motion is also GRANTED as to all claims for injunctive relief against all named defendants except for Commissioner Joseph Ponte.  The motion is DENIED as to the claims against Ponte for injunctive relief from violations of the Fourteenth Amendment arising from plaintiff's confinement in Enhanced Supervision Housing, and violations of the First Amendment arising from denial of access to Muslim religious services.

I.    BACKGROUND[2]

Hamilton is an inmate in the custody of the New York City Department of Correction.  (4031 Am. Compl. at 1.)  As stated above, he has filed two law suits with distinct overlapping theories of constitutional violations.  The Court considers both suits jointly in this opinion.  The first suit primarily alleges that his rights have been violated based on his designation to a particular housing unit.  (Id. at 3A-

---

[2] For purposes of this motion, the Court accepts all well-pled factual allegations in Hamilton's complaints as true.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

3B.)  The second suit primarily alleges that the conditions of Hamilton's confinement within that unit violate his constitutional rights.  (9458 Compl.)

On March 25, 2015, Corrections Officer Joseph Miller observed three inmates assaulting a fourth inmate within the Anna M. Kross Center ("AMKC"), one of the facilities on Rikers Island.  (4031 2d Am. Compl at 3E.)  A second Corrections Officer, Christopher Davidson, arrived shortly thereafter and witnessed the fourth inmate lying on the floor, but did not witness the assault itself.  (Id. at 3F.)  Both Officers created dual incident reports date March 25, 2015 detailing what they had seen and listing the inmates involved.  (Id. at 3C-3F.)  None of these documents referenced Hamilton.

Officer Davidson also created a second document on March 25, 2015, titled Report and Notice of Infraction.  (Id. at 3G.)  This document reported that Officer Miller had informed Officer Davidson he had witnessed several inmates assault another inmate.  (Id.)  The same victim was listed, but the number of perpetrators rose from three to five.  (Id.)  One of the two additional inmates was Hamilton.  (Id.)  This document charged Hamilton with three assault offense infractions.  (Id.)

On March 26, 2015, Hamilton was scheduled to appear in court but was then prevented from attending, apparently because he was told he had to obtain an Injury Report from the prison's medical provider.  (Id. at 3A.)  His complaint further alleges that the Department of Correction instead told the court that Hamilton had refused to appear.  (Id.)  Hamilton was placed in Pre-Hearing Detention Housing, also referred to as Punitive Segregation Housing, in the Otis Bantum Correctional Center ("OBCC") pending a hearing on his assault charge.  (Id. at 3J-3K.)

3

On March 31, 2015, Hamilton appeared at a hearing on his charged infraction.  (Id. at 3A.)  He was informed that the investigation into the March 25 assault had been conducted by Officers Davidson and Miller, Captain Latonia Monroe, Captain Johanne Saint Fleur, the Deputy Warden, and the Deputy Warden of Security.  (Id.)  At the hearing, Hamilton learned that the infraction was being dismissed.  (Id.)  The ensuing Hearing Report and Notice of Disciplinary Disposition noted that Hamilton had not appeared on the initial incident reports and thus that the infraction was not supported by any documentation.  (Id. at 3H-3I.)

Following the dismissal of the charges against him, Hamilton remained in Punitive Segregation Housing.  (Id. at 3A.)  He believed, and continues to assert, that he should have been re-designated within 24 hours, but when he brought this up with staff he was told that the Department of Corrections no longer handles release dates from punitive segregation, and that such decisions were instead made by Joseph Ponte and the staff in his office.  (Id.)  He received his disposition papers from the hearing on April 6, 2015, rather than within 24 hours as he argues regulations require.  (Id.)

Around April 7, 2015, Hamilton was removed from Punitive Segregation Housing and transported to the Brooklyn Detention Center.  (Id.)  Although Hamilton alleges he is "not under Enhanced Restraint status," he was placed in Enhanced Restraints, which include security mitts, handcuffs, waist chains, and leg irons, while being transported.  (Id.)  He was also forced to wear departmental-issued attire and footwear.  (Id.)  The following evening he was transported back to OBCC, again subject to Enhanced Restraints.  (Id.)  He was placed in "regular

population low classification housing" at OBCC and informed that his brief stay at the Brooklyn Detention Center had been a mistake, as his level four classification was too low to be housed around the inmates housed there.  (Id.)

Approximately ten days after the preceding events, on April 18, 2015, an area Captain told Hamilton to pack his belongings because he was "signed up" for a program called Enhanced Supervision Housing, or ESH.  (Id.)  Hamilton claims that Enhanced Supervision Housing "is not a program at all," but is instead "the new punitive segregation for the worst inmates on Rikers Island."  (Id.)  He claims to be the only inmate in ESH with a level four security classification, while all the other inmates have higher classifications.  (Id. at 3A-3B.)  He complained about his assignment to "punitive segregation" to the Deputy Warden of Security, who referred him to several other individuals until he was told that "Joseph Ponte along with this staff office" deals with "punitive segregation," so Hamilton "had no choice but to wait."  (Id. at 5.)

Hamilton's complaint further states that inmates are only supposed to be in ESH for 45 days, but that despite having "completed all programs . . . which were one of the ways to get out of here in 45 days," he had been kept in this unit for ten months as of February 2016.  (Id. at 3B.)

The rest of Hamilton's initial complaint, and the bulk of his second complaint, relate to the conditions within ESH.  He alleges that prisoners in ESH are fully segregated from the regular prison population, made to wear waist chains and handcuffs anytime they are escorted through the prison, and are prevented from having any personal clothes.  (Id.)  He also alleges that ESH prisoners have

5

severely limited access to the law library, are prevented from having inmate rule books establishing the rules, and that the only religious services provided to them are Christian, while Hamilton is Muslim.  (Id.)  Hamilton also alleges that while most prisoners on Rikers Island are only locked in their cells from 9:00 p.m. to 5:00 a.m. each day, in ESH the lock-in begins at noon and runs until after 5:00 a.m.  (Id.) On some occasions, prisoners in ESH, including Hamilton, have been locked-in for twenty-five hours at a time without access to showers or any other opportunity to leave their cells.  (Id. & 9458 Compl. at Attachment 1.)  In addition, there is no air conditioning, and the temperature at times exceeds 90 degrees.  (Id.)

As a result of his experiences in ESH, Hamilton reports that he has suffered "many mental injuries" and is "always depressed."  (4031 Am. Compl. at 3B.)  His treatment in ESH has caused him "to become detach[ed] from others, recluse, questioning [his] self worth, and at times, thoughts of ending [his] life."  (9458 Compl. at Attachment 1.)

In both of his complaints, Hamilton alleges that he filed a grievance but was told that his complaints were "non grievable" by the "Grievance Coordinator."  (Id. at 4, 4031 Am. Compl. at 4.)  He provided further information about this process in his opposition to defendants' motion to dismiss.  (4031 ECF No. 30. ("Opp."))  In that brief, Hamilton alleges that he "gave a Prison Official his grievance to deposit in the grievance box."  (Id. at 3.)  He alleges that he "did not receive a response," and then "made a written notice in accordance to Grievance policies for his grievance to be

forwarded to the next step, which was to a Mr. Harris of the CORC," or Central

Office Review Committee.[3]  (Id.)

The complaint requests injunctive relief in the form of Hamilton's removal

from ESH, and monetary damages in the amount of $1,000,000 to "make [Hamilton]

whole for mental injuries, stress, depression, loss of personal property, mentally

unstable environment, [and] emotional distress caused by actions of Department of

Corrections staff."  (4031 Am. Compl. at 5.)  Hamilton seeks access to "religious

services . . . for me being Muslim," (id. at 3B), "to which plaintiff is entitled to

pursuant to . . . the First Amendment of the United States Constitution."  (Opp. at

2.).

## II.   LEGAL PRINCIPLES

Construed liberally, Hamilton alleges four sets of claims: (1) that his

confinement in punitive segregation more than a week after the dismissal of the

infraction complaint violates the Fourteenth Amendment's Due Process Clause; (2)

that his assignment to and continued confinement in ESH for almost a year without

process also violates the Due Process Clause; (3) that the conditions of confinement

in ESH violate the Eighth Amendment; and (4) that the unavailability of Muslim

religious services in ESH violates the First Amendment.[4]  For the reasons that

---

[3] Hamilton's opposition to also includes, for the first time, an allegation that he was "physically assaulted by Prison Officials E.S.U. (Emergency Services Unit)."  (Opp. at 2.)  Specifically, Hamilton writes that he was "beaten with batons and sprayed with a chemical agent (MK-9) while in a submissive stance (hands on top of head, and on his knees) showing no threatening posture."  (Id.) These allegations are not cognizable when raised for the first time in an opposition to a motion to dismiss.

[4] Hamilton also alleges that his due process rights were violated by his placement in enhanced restraints while being transported to and from the Brooklyn Detention Center, by his wearing a "dirty orange jump suit" while "everyone else was wearing gray jumpsuits," and by the high demand placed on the prison legal resources.  (4031 Am. Compl. at 3A.)  These allegations have no legal

follow, plaintiff fails to plead a due process violation for his confinement to punitive

segregation for eight days following the disciplinary hearing, and he fails to plead

any claims under the Eighth Amendment.  Plaintiff successfully pleads claims

under the Fourteenth and First Amendments related to his assignment to and

continued confinement in ESH, but he fails to adequately plead personal

involvement of any individual defendant sufficient to sustain a claim for money

damages under § 1983.  Plaintiff's sole surviving claims are for injunctive relief

against one defendant, Commissioner Ponte, arising from Hamilton's well-plead

claims that his due process and First Amendment rights have been violated.

A.     <u>Motion to Dismiss Standard</u>

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for

"failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

To survive a Rule 12(b)(6) motion, a plaintiff must provide grounds upon which his

claim rests through "factual allegations sufficient 'to raise a right to relief above the

speculative level.'"  <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d

Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  In other

words, the complaint must allege "enough facts to state a claim to relief that is

plausible on its face."  <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (2d Cir.

2010) (quoting <u>Twombly</u>, 550 U.S. at 570).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable

---

merit.  Shotgun application of the term "due process" to every aspect of confinement does not
transform basic features of prison life into constitutional claims.

inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." <u>Id.</u> The Court will give "no effect to legal conclusions couched as factual allegations." <u>Port Dock & Stone Corp. v. Oldcastle Ne., Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 555). Knowledge and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b). A plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession and control of the defendant." <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 120 (2d Cir. 2010). But, if the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate. <u>Twombly</u>, 550 U.S. at 570; <u>Starr</u>, 592 F.3d at 321 (quoting <u>Iqbal</u>, 556 U.S. at 679).

In deciding a 12(b)(6) motion, the Court may not consider evidence proffered by any party, but is instead limited to the allegations in the  complaint and facts from documents either referenced therein or relied upon in framing the complaint. <u>See</u> <u>DiFolco v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir. 2010).

It is also relevant that Hamilton is proceeding <u>pro se</u> in this matter. "It is well established that the submissions of a <u>pro se</u> litigant must be construed liberally and interpreted 'to raise the strongest arguments that they <u>suggest</u>.'" <u>Triestman v.</u>

<u>Fed. Bureau of Prisons</u>, 470 F.3d 471, 474 (2d Cir. 2006) (quoting <u>Pabon v. Wright</u>, 459 F.3d 241, 248 (2d Cir. 2006)) (emphasis in original). "Pro se submissions are generally reviewed with 'special solicitude,' and we interpret them to raise the strongest claims possible." <u>Kalican v. Dzurenda</u>, 583 F. App'x 21, 22 (2d Cir. 2014) (quoting <u>Triestman,</u> 470 F.3d at 475). Although a <u>pro se</u> complaint must state a plausible claim for relief or it will be dismissed, <u>Harris v. Mills</u>, 572 F.3d 66, 72 (2d Cir. 2009), "district courts should not dismiss a pro se complaint without granting the plaintiff at least one opportunity to amend." <u>Shabazz v. Bezio</u>, 511 F. App'x 28, 30 (2d Cir. 2013) (citing <u>Branun v. Clark</u>, 927 F.2d 698, 705 (2d Cir. 1991) (holding that district courts should not dismiss pro se complaints "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated"); <u>see also</u> <u>J.S. v. T'Kach</u>, 714 F.3d 99, 106 ("[W]ith respect to SHU detention, the district court should have <u>sua sponte</u> granted [plaintiff] leave to replead [his due process claims] before <u>sua sponte</u> dismissing the complaint.").

       B.    <u>Prison Litigation Reform Act Requirements</u>

       Federal law imposes certain restrictions on suits by prisoners. First, pursuant to 42 U.S.C. § 1997e(a), a prisoner may not bring a federal action "with respect to prison conditions . . . until such administrative remedies as are available are exhausted." The Supreme Court has recently clarified that there are (at least) "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief," and thus is not "available" under § 1997e(a). <u>Ross v. Blake</u>, 136 S. Ct. 1850, 1859 (2016). An

administrative grievance remedy is not available where "it operates as a simple

dead end—with officers unable or consistently unwilling to provide any relief;"

where it is "so opaque that it becomes, practically speaking, incapable of use;" and

where "prison administrators thwart inmates from taking advantage of a grievance

process through machination, misrepresentation, or intimidation." Id. at 1859-60.

The same federal statute discussed above also provides that a prisoner may

not bring a federal action "for mental or emotional injury suffered while in custody

without a prior showing of physical injury or the commission of a sexual act." 42

U.S.C. § 1997e(e). The alleged physical injury must be more than de minimis.

Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999). This provision does not, however,

require a prisoner to allege a physical injury before seeking injunctive relief,

declaratory relief, nominal damages, or punitive damages. Thompson v. Carter, 284

F.3d 411, 418 (2d Cir. 2002). In addition, § 1997e(e) does not bar a prisoner from

seeking compensatory damages for a loss of property. Id.

C.    Personal Involvement

To state a claim against individual defendants under 42 U.S.C. § 1983, "a

plaintiff must allege the violation of a right secured by the Constitution and laws of

the United States, and must show that the alleged deprivation was committed by a

person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

"Because vicarious liability is inapplicable to . . . section 1983 suits, a plaintiff must

plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution." Iqbal, 556 U.S. at 676.

When a § 1983 plaintiff seeks money damages, he or she must adequately plead "personal involvement of defendants in [the] alleged constitutional deprivations." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  A plaintiff may plead personal involvement by a supervisory defendant by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[5]

However, if a "complaint adequately allege[s]" a constitutional violation against a prison official who "ha[s] overall responsibility to ensure" the constitutional rights of inmates, the claim for injunctive relief can survive a motion to dismiss.  Koehl v. Dalsheim, 85 F.3d 86, 89 (2d Cir. 1996); see also Parkell v. Danberg, __ F.3d __, 2016 WL 4375620, at *10 (3d Cir. Aug. 17, 2016) ("Our conclusion that the State Defendants lacked personal involvement in past constitutional violations does not preclude [plaintiff] from obtaining prospective injunctive relief for ongoing violations."); Davidson v. Scully, 148 F. Supp. 2d 249,

---

[5] The continuing applicability of all five Conlon prongs after Iqbal has been called into question by some district court decisions in this Circuit, and the Second Circuit has not definitively ruled on the issue.  See Doe v. New York, 97 F. Supp. 3d 5, 11-12 (S.D.N.Y. 2015) (discussing "confusion on the issue" but observing that "the majority of courts [have] emphasiz[ed] that neither the Second Circuit nor the Supreme Court has endorsed this reading of Iqbal" (internal quotation marks omitted)). Because Hamilton does not show personal involvement under any of the Conlon factors, the Court need not address whether any has been implicitly abrogated by Iqbal.

254 (S.D.N.Y. 2001) ("Personal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under 42 U.S.C. § 1983.")  (quoting Glass v. Coughlin, No. 91-cv-0193, 1991 WL 102619, at *2 (S.D.N.Y. May 29, 1991).

      D.    <u>Due Process</u>

The Fourteenth Amendment protects inmates from placement in confinement that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" without due process.  <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995).  Determining whether an inmate has received procedural due process involves a two-prong inquiry: "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law."  <u>Tellier v. Fields</u>, 280 F.3d 69, 80 (2d Cir. 2000) (quoting <u>Sealey v. Giltner</u>, 116 F.3d 47, 51 (2d Cir. 1997) (ellipsis omitted)).  Although "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement," the Supreme Court has held "that a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations[.]"  <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221-22 (2005).  The Second Circuit has also recognized that due process requirements may be triggered when "defendants act[] in bad faith, labeling as administrative a confinement that could only be justified as punitive," <u>Sealey</u>, 116 F.3d at 52-53, and by "failure to conduct regular status reviews" of ongoing solitary confinement, <u>see</u> <u>Fludd v. Fischer</u>, 568 F. App'x 70, 73 (2d Cir. 2014) (citing <u>Hewitt v. Helms</u>, 459 U.S. 460, 472, 477 n.9 (1983)).

      1.    <u>Liberty Interest.</u>

"A liberty interest may arise from the Constitution itself . . . or . . . from an expectation or interest created by state laws or policies." <u>McMahon v. Fischer</u>, 446 F. App'x 354, 356 (2d Cir. 2011) (quoting <u>Wilkinson</u>, 545 U.S. at 221)).  Whether an inmate has a protected liberty interest in avoiding a particular kind of confinement depends on both "the duration and conditions of confinement," <u>T'Kach</u>, 714 at 106, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." <u>Palmer v. Richards</u>, 364 F.3d 60, 64 (2d Cir. 2004) (quoting <u>Sealy</u>, 197 F.3d at 586). "[A] deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration." <u>Welch v. Bartlett</u>, 196 F.3d 389, 394 (2d Cir. 1999).

"For the purpose of establishing a liberty interest, a district court should consider the entire 'sustained period of confinement.'" <u>Fludd</u>, 568 F. App'x at 72 (quoting <u>Giano v. Selsky</u>, 238 F.3d 223, 226 (2d Cir. 2001)).  "[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest." <u>Hanrahan v. Doling</u>, 331 F.3d 93, 97 (2d Cir. 2003).  But as confinement extends over 100 days, a district court must conduct a more detailed analysis of the conditions of confinement: "Where the plaintiff [is] confined for an intermediate duration—between 101 and 305 days—'development of a detailed

record' of the conditions of the confinement relative to ordinary prison conditions is required."  Palmer, 364 F.3d at 64-65 (quoting Colon, 215 F.3d at 232).

Although the Second Circuit has "consistently decline[d] to establish bright-line rules in this area," its decisions "have previously determined that, even under 'normal' conditions, solitary confinement for 305 days constitutes 'a sufficient departure from the ordinary incidents of prison life to require due process protections.'" Fludd, 568 F. App'x at 72 (quoting Colon, 215 F.3d at 231).  Moreover, the Second Circuit has repeatedly "indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement."  Sealey, 116 F.3d at 52; see also Davis v. Barrett, 576 F.3d 129, 135 (2d Cir. 2009) ("[T]his Court has required a 'detailed factual record,' unless 'the period of time spend in SHU was exceedingly short—less than [] 30 days . . .— and there [is] no indication that the plaintiff endured unusual SHU conditions." (quoting Palmer, 364 F.3d at 65-66)).

2.   Process Due

Once an inmate demonstrates a liberty interest in avoiding segregated confinement, he or she must also show that assignment to such confinement occurred without due process of law.  The Supreme Court has long held that the procedure due to inmates post-conviction is significantly less rigorous than that due a pre-conviction criminal defendant, as "[p]rison disciplinary proceedings . . . take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so."  Wolff v. McDonnell, 418 U.S. 539, 561 (1974); see also Sandin, 515 U.S. at 482

("[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.").  Even so, once a prisoner establishes a due process liberty interest, "[t]he fundamental requirement of due process is the opportunity to be hearing at a meaningful time and in a meaningful manner." Victory v. Pataki, 814 F.3d 47, 62 (2d Cir. 2016) (internal quotation marks omitted).

There is a "distinction between the procedural protections an inmate must be afforded when confined for 'disciplinary' reasons and those required when his confinement is for 'administrative' purposes." Wheeler-Whichard v. Roach, 468 F. App'x 28, 30 (2d Cir. 2012).  An inmate assigned to disciplinary confinement is "entitled to advance written notice of the charges against him; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary action taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004).  Assignment to administrative confinement, by contrast, requires only "some notice of the charges against [the inmate] and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." Taylor v. Rodriguez, 238 F.3d 188, 192 (2d Cir. 2001) (quoting Hewitt v. Helms, 459 U.S. 460, 476 (1983)).

### 3.    New York City Board of Correction Regulations

A due process liberty interest in may arise "from an expectation or interest created by state laws or policies." McMahon, 446 F. App'x at 356.  The authorizing regulation for ESH provides both procedural and substantive predicates for prisoner

assignment to ESH.  A determination that an inmate is eligible for ESH only upon a finding that:

> (1) the inmate has been identified as a leader of a gang and has demonstrated active involvement in the organization or perpetration of violent or dangerous gang-related activity; (2) the inmate has demonstrated active involvement as an organizer or perpetrator of a gang-related assault; (3) the inmate has committed a slashing or stabbing, has committed repeated assaults, has seriously injured another inmate, visitor, or employee, or has rioted or actively participated in inmate disturbances . . . ; (4)  the inmate has been found in possession of a scalpel or a weapon that poses a level of danger similar to or greater than that of a scalpel . . . ; (5) the inmate has engaged in serious or persistent violence; or (6) the inmate . . . has engaged in repeated activity or behavior of a gravity and degree of danger similar to the acts described in paragraphs (1) through (5) of this subdivision, and such activity or behavior has a direct, identifiable and adverse impact on the safety and security of the facility, such as repeated acts of arson . . . .

N.Y.C. Rules tit. 40, § 1-16(b) (2016).  Procedurally, an inmate must be given written notice within 24 hours of placement in ESH informing him or her, inter alia, of the basis for the placement and the right to review evidence relied upon by the Department of Correction.  Id. § 1-16(f).  An inmate is also entitled to an in-person review hearing at which, inter alia, the inmate has a right to appear, present evidence, call witnesses, and receive the assistance of a hearing facilitator.  Id. § 1-16(g).  The ESH regulation also provides for periodic review of the ESH placement every 45 days "to determine whether the inmate continues to present a significant threat" sufficient to justify continued assignment to ESH.  Id. § 1-16(h)(1).

17

E.    <u>Conditions of Confinement</u>

The Eighth and Fourteenth Amendments prohibit states from inflicting "cruel and unusual punishments."  U.S. Const. Amend. VIII.  "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (internal citations and quotation marks omitted).

"In order to state a claim that conditions of confinement violate the Eighth Amendment, plaintiff must satisfy both an objective and subjective test: (1) the deprivation denied him 'the minimal civilized measures of life's necessities,' and (2) the defendants effectuated the deprivation with either a 'sufficiently culpable state of mind' or with 'deliberate indifference.'"  <u>Delgado v. Dembar</u>, No. 13-cv-191, 2014 WL 4792068, at *4 (S.D.N.Y. Sept. 24, 2014) (quoting <u>Jabbar v. Fischer</u>, 683 F.3d 54, 57 (2d Cir.2012)).  Under the objective test, prisoners "may not be deprived of their 'basic human needs—<u>e.g.</u>, food, clothing, shelter, medical care, and reasonable safety'—and they may not be exposed 'to conditions that pose an unreasonable risk of serious damage to [their] future health."  <u>Jabbar</u>, 683 F.3d at 57 (quoting <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 185 (2d Cir. 2002)).  Aggregated conditions of confinement may "rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" <u>Walker v. Schult</u>, 717 F.3d 119, 125 (2d Cir. 2013) (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 304 (1991)).

18

Under the subjective test, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.  [A]n official's failure to alleviate a significant risk that he should have perceived but did not . . . [cannot] be condemned as the infliction of punishment."  <u>Jabbar</u>, 683 F.3d at 57 (internal citations and quotation marks omitted).  Negligence is insufficient to show the subjective component of an Eighth Amendment claim; at the very least, a plaintiff must demonstrate that "a risk was 'obvious or otherwise must have been known to a defendant' [to] be sufficient for a fact finder to conclude that the defendant was actually aware of the risk."  <u>Walker</u>, 717 F.3d at 125 (quoting <u>Brock v. Wright</u>, 315 F.3d 158, 164 (2d Cir. 2003)).

F.    <u>First Amendment</u>

"Inmates clearly retain protections afforded by the First Amendment[.]" <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987); <u>see also</u> <u>Jackson v. Mann</u>, 196 F.3d 316, 320 (2d Cir. 1999) ("An inmate is . . . entitled to a reasonable accommodation of his religious beliefs.").  These protections have long been understood to include freedom a right of access to religious services.  <u>Young v. Coughlin</u>, 866 F.2d 567, 570 (2d Cir. 1989) ("[W]e have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible.").  It is "error to assume that prison officials [are] justified in limiting [an inmate's] free exercise rights simply because [the inmate is] in disciplinary confinement," <u>id.</u>, as "it [is] well established that a prisoner's free exercise right to participate in religious services is not extinguished by his or her

19

confinement in special housing or keeplock[.]" <u>Ford v. McGinnis</u>, 352 F.3d 582, 597

(2d Cir. 2003) (citing <u>Sallahuddin v. Coughlin</u>, 993 F.2d 306, 308 (2d Cir. 1993)).

Even so, "limitations on the exercise of [these] constitutional rights arise both

from the fact of incarceration and from valid penological objectives-including

deterrence of crime, rehabilitation of prisoners, and institutional security." <u>O'Lone</u>,

482 U.S. at 348.  To defeat the free exercise claim of an inmate who has been denied

access to religious services, prison officials must "proffer an explanation as to why

[the inmate] was denied access to religious services, or articulate a particular

penological interest that was served by denying [the inmate] such access." <u>Young</u>,

866 F.2d at 570.  "[I]t [is] incumbent upon prison officials to make such a showing in

order to prevail on a motion to dismiss." <u>Id.</u>

III.   ANALYSIS

    A.   <u>Prison Litigation Reform Act Requirements</u>

Defendants argue that this matter must be dismissed because Hamilton has

failed to comply with the requirements of the Prison Litigation Reform Act.  They

argue that he has both failed to exhaust his available administrative remedies and

failed to allege an adequate physical injury before advancing theories of emotional

and mental suffering.  At this motion to dismiss stage, the Court does not agree that

either of these grounds provide an appropriate basis for dismissal of Hamilton's

claims.

As described above, Hamilton has advanced two seemingly distinct bases to

excuse his failure to grieve his claims before bringing them in federal court.  In his

complaints, he alleges that he was told by a prison official that the issues he raised

were non-grievable; in his opposition papers to the instant motion, he alleges that

did twice attempt to submit written grievances but never received a response.  The

Court does note the apparent contradiction between these accounts.  However, the

Court is required to construe Hamilton's <u>pro se</u> complaint liberally and to draw all

inferences in favor of any plaintiff on a Rule 12(b)(6) motion to dismiss.  In that

light, Hamilton's complaint can be understood to allege that no administrative

remedies were in fact "available" to him because prison administrators thwarted his

attempts to make use of them.  At the motion to dismiss stage, that allegation is

sufficient.

Similarly, at this early stage the Court will not dismiss Hamilton's claims

based on the absence of an allegation of direct physical injury.  Defendants are

correct that the complaint focuses on Hamilton's alleged mental and emotional

suffering, both in its specific allegations and in its request for relief.  However, one

of the complaints does reference "back pain," (4031 Am. Compl. at 3), and Hamilton

seeks injunctive relief in the form of a court order reassigning him within the state

prison system, which does not depend on allegations of physical injury.  <u>Thompson</u>,

284 F.3d at 418.

B.   <u>Due Process Claims</u>

Hamilton alleges claims relating to both his confinement in punitive

segregation and his assignment to and continued confinement in ESH for almost a

year.  Only his claims relating to confinement in ESH can survive a motion to

dismiss.

21

1.   Liberty Interest

Defendants argue that Hamilton cannot state a due process claim for his confinement in punitive segregation for the eight days following his disciplinary hearing because this confinement does not trigger a liberty interest.  The Supreme Court and the Second Circuit have held that solitary confinement for less than 30 days, unless extraordinarily harsh, will not trigger a liberty interest.  See Sandin, 515 U.S. at 486; Palmer, 364 F.3d at 66.  Hamilton does not make any allegations that the conditions of his confinement in punitive segregation for eight days were so extraordinarily harsh as to overcome this presumption.  He therefore fails to plead a liberty interest sufficient for this claim to survive the motion to dismiss.

Defendants also argue that Hamilton does not state a claim under the Due Process Clause because the conditions of ESH described by the complaint are not as harsh as those in solitary confinement, and therefore he cannot demonstrate a due process liberty interest.  This analysis is flawed in at least two ways.  First, the Second Circuit has made clear that the existence of a due process liberty interest turns on both the length and the conditions of confinement.  Segregated confinement even for a short period can trigger a liberty interest if conditions are sufficiently harsh and atypical as compared to routine prison life; conversely, confinement in less harsh (but still atypical) conditions can trigger a liberty interest if that confinement is sufficiently lengthy.  Palmer, 364 F.3d at 64 ("[E]specially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical.").

At least in the context of solitary confinement, the Second Circuit has held that confinement for 305 days or more readily triggers a due process liberty interest.  Palmer, 364 F.3d at 64-65.  As of the date he filed his opposition, Hamilton had been confined in ESH for a few days short of a year.  This is well beyond the "intermediate" period of time of 101 to 305 days for which the Second Circuit requires a detailed investigation into the conditions of confinement.  Palmer, 364 F.3d at 65.  Defendants fail to analyze the relevance of the lengthy duration of Hamilton's ESH confinement to the existence of a liberty interest under the Fourteenth Amendment.

Second, defendants mistakenly compare the conditions in ESH to conditions in solitary confinement only.  This is not the correct test.  The appropriate comparison is between "the actual conditions of the challenged confinement compared with ordinary prison conditions."  Brooks v. DiFasi, 112 F.3d 46, 49 (2d Cir. 1997) (emphasis added); see also Davis, 576 F.3d at 135 ("A detailed factual record containing information as to actual conditions in both [the challenged confinement] and for the general population is necessary for the court to make the type of comparison required.").  Hamilton, by contrast, does allege a comparison of ESH to ordinary prison conditions.  He alleges that while ESH is supposed to be "a regular housing area," conditions are harsher than regular housing because, inter alia, "[e]very other day, we are locked in for a period of over TWENTY-FIVE (25) HOURS," (9458 Compl. Attachment 1), he is denied "regular feeding[] that [is] provided to regular population," and he is frequently denied recreation that he would have access to in general population.  (4031 Am. Compl. at 3B.)

23

In light of Hamilton's allegations of a lengthy duration of confinement in ESH and significant differences from general population conditions, his claims preclude dismissal at this time.  The Court notes that as his available relief is solely injunctive, if he is no longer in ESH, defendants are invited to submit a prompt summary judgment motion.

> 2.   Process Due

Defendants argue that even if Hamilton's complaint states "a due process claim of some kind" (which the Court takes to mean "liberty interest"), he cannot meet the second prong of a due process claim because he "does not allege that he was deprived of any due process entitlements with respect to his placement in Enhanced Supervision Housing or regarding any of the alleged conditions there." (ECF No. 10 at 12-13.)

Hamilton's complaints allege three such deprivations.  First, Hamilton states that the only notice he received of his ESH assignment was being told by an area captain "to pack up" because he "was signed up for a program which is not a program at all called Enhanced Supervision Housing."  (4031 Am. Compl. at 3A.) Construing his complaint liberally, this indicates that he did not receive the written notice and opportunity for a review hearing provided for in the Board of Correction's ESH regulations, and it does not meet the basic due process requirement of "the opportunity to be heard at a meaningful time and in a meaningful manner." Victory, 814 F.3d at 62.

Second, the complaint specifically references the 45-day review period provided for the in ESH regulations, and Hamilton denies that he was provided

24

sufficient regular status review despite his nearly year-long confinement. (4031 Am. Compl. at 3B) (stating that plaintiff has "completed all programs here [in ESH] which were one of the ways to get out of here in 45 days because this is supposed to be an 45 day program but yet I've been here Ten (10) months there is no way out of this so called program"). Defendants do not address Hamilton's claim that he has suffered ten months of confinement in ESH without sufficient status review. This alleged failure to provide periodic review states an additional claim for relief. See Fludd, 568 F. App'x at 73 (reversing and remanding the dismissal of a prisoner's due process claims because "failure to conduct regular status reviews" of ongoing solitary confinement implicates constitutional due process).

Third, Hamilton also alleges that he "was improperly disciplined by being placed in punitive segregation and then an enhanced supervision housing unit when the infraction against him was dismissed," which makes out an additional due process claim. (ECF No. 10 at 10.) The Second Circuit has recognized that due process requirements may be triggered when "defendants act[] in bad faith, labeling as administrative a confinement that could only be justified as punitive," Sealey, 116 F.3d at 52-53. Hamilton claims that "[m]y status [in ESH] once again is all due to an infraction that was dismissed[.]" (4031 Am. Compl. at 3A.) Defendants acknowledge this allegation but do not explain why punishment in these circumstances does not implicate due process. These allegations, which defendants themselves adopt in their motion to dismiss, forms yet a third plausible constitutional claim.

25

Hamilton therefore meets the second prong of the test for a due process claim because it appears he received no process relating to his assignment to ESH and did not receive regular status review while confined to ESH.  If Hamilton did receive process before being assigned to ESH but was punished despite the dismissal of allegations against him, this also implicates his constitutional rights.[6]  Accepting the complaint's factual allegations as true, which the Court must do at the motion-to-dismiss stage, Hamilton states plausible claims that his initial assignment to ESH and the failure of the Board of Correction to conduct regular review of his ESH assignment violate the Due Process Clause.

The Court notes that the Second Circuit's jurisprudence on due process requirement for prison housing assignment has developed primarily in the context of solitary and keeplock confinement, and that ESH is a relatively new form of segregated housing that has not yet been thoroughly examined in this Circuit for its Fourteenth Amendment implications.  Regardless of what process might be due before a transfer to ESH after a merits analysis, at the motion-to-dismiss stage Hamilton has alleged sufficient facts to demonstrate a liberty interest that renders his lack of process plausibly constitutionally deficient under the Fourteenth Amendment's Due Process Clause.

C.    Eighth Amendment Claims

Hamilton's complains of a host conditions of confinement that the Court construes to allege violations of the Eighth Amendment.  However, the same

---

[6] If Hamilton's assignment to ESH was indeed punitive rather than administrative, that increases the degree of process that was due to him before his assignment under the Second Circuit's jurisprudence. See Sira, 380 F.3d at 69.

conditions and length of confinement that might give rise to a due process liberty interest do not necessarily meet the significantly higher threshold for a plausible Eighth Amendment claim.

Hamilton alleges he is permitted to shower only every other day, that he faces a "security risk" because he is housed alongside high-classification inmates, that he is denied recreation during lock-in for 24 hours at a time, that he suffers "limited contact with family [and] children," and that inmates in ESH suffer "excessive and unjust beatings." (9458 Compl. at Attachment 1.)

None of these allegations is sufficient to state an Eighth Amendment claim. All but the last are common aspects of prison life that do not "result in the denial of the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834 (internal quotation marks omitted). As to allegation of beatings, Hamilton does not provide sufficient facts about alleged "excessive and unjust beatings" to plausibly state a claim. Hamilton does not allege that he was beaten,[7] and he does not offer facts necessary to make out a claim that these alleged assaults widespread or harmful enough to constitute a "substantial risk of serious harm." Farmer, 511 U.S. at 828. Therefore, Hamilton does not make out a plausible claim either that prison officials used excessive force against ESH inmates, or failure to protect ESH inmates from a risk of harm posed by others.

Even if Hamilton's threadbare allegations could satisfy the objective prong of the test for an Eighth Amendment violation, Hamilton fails to plead sufficient facts

---

[7] In his opposition to the motion to dismiss, Hamilton adds an allegation that he was once "beaten with batons and sprayed with a chemical agent (MK-9)." (Opp. at 2.) This allegation is not cognizable when raised for the first time in an opposition memorandum.

to support the subjective prong for any of his claims.  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Farmer</u>, 511 U.S. at 837.  Hamilton fails to allege any knowledge on the part of defendants—or any prison officials—about the conditions of which he complains.  His Eighth Amendment claims based on conditions of confinement must be dismissed.

      D.    <u>First Amendment Claims</u>

      Plaintiff makes two straightforward allegations of denial of his constitutionally protected religious liberty.  First, he alleges that he has been denied access to religious services in ESH entirely.  Second, he alleges that Christians are provided religious services in ESH while Muslims like Hamilton are not.  While these allegations are simple, so are the tests for free exercise claims regarding access to religious services in prison. The Second Circuit has explained that "it [is] incumbent upon prison officials to make . . . a showing" as to why the inmate's access to religious services cannot be reasonably accommodated "in order to prevail on a motion to dismiss."  <u>Young</u>, 866 F.2d at 570.  Defendants offer no such showing.  Hamilton has therefore pleaded facts sufficient to support his First Amendment claims that he has been denied access to religious services.

E.      Claims Against Individual Defendants

Although Hamilton has successfully pleaded violations of his constitutional rights to due process and free exercise of religion, 42 U.S.C. § 1983 also requires a plaintiff seeking money damages to plead a sufficient connection between the plaintiff's claims and the acts or omissions of the named defendants.  Plaintiff has not done so.  Hamilton does not plead any facts showing that any of the named defendants were involved in his assignment to ESH or his continued confinement there, nor does he plead any facts to show that that any of the named defendants were involved in denying him access to religious services.  Although Hamilton alleges he was told that defendant Ponte and his staff were responsible for decisions about "punitive segregation," this is insufficient to state a claim for money damages under § 1983.  Hamilton does not allege that he informed Ponte or Ponte's staff of his assignment to and continued confinement in ESH without process.  Ponte was thus "never put on actual or constructive notice of the violation."  Wright, 21 F.3d at 501.  Nor does Hamilton allege that Ponte "created a policy or custom under which" the assignment of inmates to ESH without process or sufficient periodic review of the assignment occurs, or under which inmates in ESH are denied religious services.[8]  See id.  Without any factual allegations supporting a connection between the acts or omissions of Ponte to the alleged constitutional violations, Hamilton's claims for money damages against Ponte must be dismissed.

---

[8] Hamilton also does not plausibly allege the elements of a claim against a municipal entity under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), and does not name the Board of Correction as a defendants in either of his complaints.

Hamilton also seeks injunctive relief: to be released from ESH and reassigned to general population, and access to Muslim religious services.  Unlike claims for monetary damages under § 1983, claims for injunctive relief do not require a showing of personal involvement on the part of named defendants to survive a motion to dismiss.  Instead, a plaintiff who successfully pleads constitutional claims against an official acting under color of law who "ha[s] overall responsibility to ensure" the protection of prisoners' rights can survive a motion to dismiss, at least as to claims for injunctive relief.  Koehl v. Dalsheim, 85 F.3d at 89.  Hamilton does not allege any such supervisory authority for the vast majority of named plaintiffs, but he does allege that he was told that "Joseph Ponte along with his staff office deals with" punitive segregation.  (4031 2d Am. Compl. at 5.)  Additionally, as Commissioner of the Department of Correction, Ponte has supervisory responsibility for conditions at Rikers Island, including ESH.  Hamilton has therefore alleged plausible claims for injunctive relief against Ponte in his official supervisory capacity, but against no other defendant.  Put simply, the only claims that survive defendants' motion to dismiss are due process and First Amendment claims against Ponte in which plaintiff seeks release from ESH and access to religious services.

## IV.   CONCLUSION

The motion to dismiss is GRANTED with prejudice as to all of plaintiff's claims under the Eighth Amendment.  The motion to dismiss is also GRANTED with prejudice as to plaintiff's claim under the Due Process Clause relating to his confinement in punitive segregation following his disciplinary proceeding.  The

motion to dismiss is GRANTED as to all of plaintiff's remaining claims for monetary damages.  The motion to dismiss plaintiff's claims for injunctive relief from his continued confinement in ESH, and for access to religious services, is GRANTED without prejudice as to all defendants except Ponte, against whom the motion to dismiss these two claims for injunctive relief is DENIED.

SO ORDERED.

Dated:        New York, New York
              October 13, 2016

_____
          KATHERINE B. FORREST
          United States District Judge

cc:
Kareem Hamilton
441-15-01732
Rikers Island-O.B.C.C.
16-00 Hazen Street
East Elmhurst, NY 11370